ATTORNEY GENERAL--OFFIC. COPY

BILL LOCKYER
Attorney General of the State of California
RICHARD M. FRANK
Chief Deputy Attorney General
THOMAS GREENE
Chief Assistant Attorney General
KATHLEEN E. FOOTE
Senior Assistant Attorney General
ADAM MILLER, State Bar No. 168254
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5551
  Fax: (415) 703-5480
  Email: Adam.Miller@doj.ca.gov

Attorneys for the State of California

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>MARQUEE HOLDINGS, INC.,<br>a Delaware corporation,<br>d/b/a AMC ENTERTAINMENT INC.,<br><br>and<br><br>LCE HOLDINGS, INC.,<br>a Delaware corporation,<br>d/b/a LOEWS CINEPLEX<br>ENTERTAINMENT CORPORATION,<br><br>　　　　　　　　Defendants. | CASE NO. C 05 5306 MEJ<br><br>COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF THE CLAYTON ACT |

　　　Plaintiff State of California, on its own behalf and as *parens patriae* on behalf of its citizens, by and through its Attorney General, Bill Lockyer, brings this civil antitrust action to prevent the proposed merger of Marquee Holdings Inc. d/b/a AMC Entertainment Inc. ("AMC") and LCE Holdings, Inc. d/b/a Loews Cineplex Entertainment Corporation and Loews Theatres ("Loews"). If the merger is permitted to proceed, it would combine the top two first-run movie theater operators in the City and County of San Francisco, State of California ("San Francisco")

COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF CLAYTON ACT

1

1. and would substantially lessen competition and tend to create a monopoly in the theatrical exhibition of first-run commercial films in this market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff alleges as follows:

1. AMC and Loews both operate chains of movie theaters throughout the United States and worldwide, and earn revenue through the theatrical exhibition of films and concession sales. The theatrical exhibition of films is a multi-billion dollar industry, with total domestic box office revenues for 2004 exceeding $9.5 billion.

2. AMC and Loews are the two largest exhibitors of first-run commercial films[1] in San Francisco by revenue as well as number of screens. AMC operates the AMC Kabuki, located at 1881 Post Street with 8 screens, and the AMC Van Ness, located at 1000 Van Ness Avenue, with 14 screens. Loews operates the Loews Metreon, located at 101 Fourth Street with 16 screens. By combining these two companies, the proposed merger would create a circuit significantly larger than all its rivals combined in San Francisco.

3. AMC and Loews currently compete against each other in San Francisco on two levels: they compete to secure first-run films from film distributors and they compete to attract consumers. The proposed merger would eliminate both levels of competition and create a dominant exhibitor in San Francisco. As a result, the merger is likely to substantially lessen competition in the markets for theatrical exhibition of first-run commercial films in San Francisco.

4. The reduction in competition caused by the proposed merger would enhance the ability of the merged firm to raise ticket prices and reduce investment in theater improvements and renovations in San Francisco. The merger would also give the merged firm market power in its dealings with distributors, including the ability to depress film rental terms.

## I. Jurisdiction and Venue

5. This action is filed by the State of California, through its Attorney General, as *parens patriae*, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 7 of the Clayton Act, 15 U.S.C. § 18.

---

1. First-run commercial films refer to feature length motion pictures, and exclude purely art or foreign language films.

COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF CLAYTON ACT

2

6.  Both AMC and Loews operate theaters in this District and throughout the United States. The distribution and exhibition of first-run commercial films is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce. The defendants purchase substantial quantities of equipment, services, and supplies from sources located outside of California. The Court has jurisdiction over the subject matter of this action and jurisdiction over the parties pursuant to 15 U.S.C. §§ 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

7.  Venue in this District is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b).

## II. Background: The Movie Industry

8.  Theatrical exhibition of feature length motion picture films ("movies") provides a major source of out-of-home entertainment in the United States. Although they vary significantly, ticket prices for movies tend to be less expensive than many other forms of out-of-home entertainment, particularly live entertainment such as sporting events and theater. Movies have therefore retained their appeal as mass entertainment: over one and one half billion movie tickets were sold in the United States in 2004.

9.  "Exhibitors" are companies that operate movie theaters. Some exhibitors own a single theater, whereas others own a circuit of theaters within one or more regions of the United States. AMC and Loews are national exhibitors and each operates one of the largest theater circuits in the United States.

10. "Distributors" are companies that engage in the business of licensing movies to exhibitors. Distributors arrange for the promotion and marketing of movies and contract with exhibitors to exhibit movies at theaters throughout the country. Established distributors include Buena Vista, Twentieth Century Fox, Universal, Sony Pictures and Warner Bros.

11. Distributors negotiate with exhibitors to exhibit movies. Exhibitors compete to obtain movies at their theaters that they believe will be successful, and distributors choose theaters to exhibit their movies based on the quality, location, and grossing potential of the theaters and the particular terms offered by the exhibitors.

12. The terms of the agreements pursuant to which distributors license movies to exhibitors vary and are individually negotiated. However, each agreement typically specifies a formula pursuant to which box office revenues are divided between the exhibitor and the distributor.

13. Exhibitors set ticket prices for each theater based on a number of factors, including the competitive situation facing each theater.

### III. Defendants and the Proposed Merger

14. Defendant Marquee Holdings Inc. is a Delaware corporation with its principal place of business in Kansas City, Missouri, and does business under the name AMC Entertainment Inc. and AMC Theatres. As of June 1, 2005, AMC operated 215 theaters with 3,308 screens and is the second largest exhibitor in the United States.

15. Defendant LCE Holdings, Inc is a Delaware corporation with its principal place of business in New York, New York, and does business under the name Loews Cineplex Entertainment Corporation and Loews Theatres. As of June 1, 2005, Loews operated 131 theaters with 1,427 screens and is the sixth largest exhibitor in the United States.

### IV. The Relevant Markets

#### A. Product Market

16. Movies differ significantly from other forms of entertainment. The experience of viewing a movie in a theater is an inherently different experience from a live show, a sporting event, or viewing a videotape or Digital Video Disk ("DVD") in the home. Ticket prices for movies are generally very different than prices for other forms of entertainment: live entertainment is typically significantly more expensive than a movie ticket, whereas renting a videotape or DVD is usually significantly cheaper than viewing a first-run movie in a theater. Because going to the movies is so different an experience from other forms of entertainment and because movie prices are significantly different from other forms of entertainment, small but significant price increases for movie tickets generally do not cause a sufficient number of consumers to shift to other forms of entertainment to make the increase unprofitable.

17. A movie is considered to be in its "first run" during the initial weeks following its release in a given locality. If successful, a movie may be exhibited at other theaters after the first run as part

of a second or subsequent run (often called a sub-run). Tickets at theaters exhibiting sub-run movies usually cost significantly less than tickets at first-run theaters. Because the movies exhibited at sub-run theaters are no longer new releases, most consumers do not regard sub-run movies as an adequate substitute for first-run movies and would not switch to sub-run movies if the price of first-run movies was increased by a small but significant amount. This is also due to the fact that sub-run theaters are typically inferior locations and quality compared to first-run locations. The availability of sub-run theater locations has greatly diminished in recent years.

18. From the perspective of distributors, there is no adequate substitute for first-run theaters when selecting locations to exhibit first-run commercial films. Distributors typically seek to have their newly released commercial films exhibited widely in high-quality theaters. A small but significant reduction in the licensing fees paid to distributors by exhibitors would not cause the distributors to exhibit their movies in anything other than first-run theaters.

19. The relevant product market within which to assess the competitive effects of this merger is the exhibition of first-run commercial films: from the consumers' perspective, the market is first-run commercial films and from the distributors' perspective, the market is first-run theaters in which to exhibit first-run commercial films.

### B. Geographic Markets

20. Consumers typically do not want to travel far from their homes to attend a movie, particularly in urban areas. Accordingly, geographic markets for first-run commercial film are predominantly local.

21. San Francisco is a peninsula bounded on three sides by water. To reach movie theaters to the north or east would require consumers to travel either the Golden Gate Bridge to the north, or the Bay Bridge or via Bay Area Rapid Transit (underwater) to the east. To reach movie theaters south of San Francisco would require traveling outside of the city limits of San Francisco. Consumers in San Francisco typically are reluctant to travel outside city limits to attend a movie. A small but significant price increase for movie tickets in San Francisco would not cause a sufficient number of consumers to travel out of city limits to make the increase unprofitable. San

COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF CLAYTON ACT
5

Francisco and smaller areas contained therein constitutes a relevant geographic market in which to assess some of the competitive effects of this merger.

22. From the perspective of distributors, it is important that their newly released first-run commercial films be exhibited in San Francisco. San Francisco has a high population density and is home to influential movie critics -- critics whose review of a movie can affect the movie's performance regionally and nationwide. Because of the visibility and importance of the San Francisco market, theaters in other geographic areas cannot substitute for theaters in San Francisco: a distributor cannot "pass" (i.e., not show a movie in) San Francisco. From the distributor perspective as well as the movie-goer perspective, San Francisco and smaller areas contained therein constitutes a relevant geographic market.

23. The exhibition of first-run commercial films in San Francisco constitutes a relevant market (i.e., a line of commerce and a section of the country) within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## V. Competitive Effects

24. In San Francisco, the proposed merger would give the newly merged entity control of 3 first-run commercial theaters with 38 screens and 2004-2005 box office revenue of over $26 million. This represents a San Francisco market share by revenue of over 85% and screen numbers of over 70% --more than all rivals combined. Post-merger, the second largest first-run commercial theater circuit in San Francisco would be Regal Entertainment Group, with a market share of roughly 6% of box office revenue and only 8 screens. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI")[2], the merger would yield a post-merger HHI of over 7600, representing an increase of over 3600.

---

2. "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. Under United States Department of Justice Merger Guidelines, markets in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See Merger Guidelines § 1.51.

COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF CLAYTON ACT

25. Entry into the market for first-run commercial movies in San Francisco, like other metropolitan locations such as Chicago or Manhattan, is particularly time-consuming and difficult and is not likely to significantly reduce the market strength of the combined entity in the near future. Available sites are scarce, and real estate and construction costs are among the highest in the nation. Identifying a site, planning the development, and constructing a theater in San Francisco takes several years.

### A. Consumer Effects

26. The proposed merger would make the competitive situation in San Francisco significantly worse by further enhancing the ability of the remaining theater circuits, particularly the newly merged AMC-Loews circuit, to increase prices.

   a. The largest and most influential circuit in San Francisco prior to merger (Loews) is price constrained by the prices charged by the other (AMC); in particular, they are constrained by the risk that the other will not follow an attempted price increase. If AMC or Loews were to increase prices and the other were not to follow, the firm that increased price might suffer financially if a substantial number of its patrons decided that the increased price was unreasonable and opted to patronize the other circuit.

   b. The proposed merger would eliminate this pricing constraint and is therefore likely to lead to higher prices for ticket buyers.

   c. These higher prices may take the form of a higher adult evening ticket price or reduced discounting for, e.g., matinees, twilight shows, seniors, students, and groups.

27. The proposed merger would also eliminate non-price competition between AMC and Loews and is therefore likely to lead to lower quality theaters for movie-goers.

   a. In order to attract consumers, and perhaps even more importantly, in order to persuade major movie studios to exhibit top movies at their respective theaters, AMC and Loews strive to maintain high quality theaters.

   b. The proposed merger would reduce competitive pressure to maintain high quality theaters. In particular, the merger would give the merged entity such a large share of the

COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF CLAYTON ACT
7

relevant markets, and of individual zones, that it would no longer need to maintain such high quality in order to attract movies.

c. The reduction of non-price competition would reduce the incentive to maintain, upgrade and renovate theaters in San Francisco, thus reducing the quality of the viewing experience for a movie-goer. It also may allow the merged entity to reduce the number of shows as there no longer would be competitive pressure to continue early and late shows.

### B. Distributor Effects

28. The higher the concentration of exhibitors in a market, the worse movie rental terms tend to be for distributors. In important markets for distributors -- such as San Francisco--this problem is magnified since "passing" the market is not a viable option.

29. The increased concentration in San Francisco as well as the elimination of the second largest competitor would reduce competition and substantially increase the ability of the newly merged entity to dictate terms to the distributors. Distributors would lose the ability to play off AMC and Loews against each other. In addition, the merged entity would have such a dominant presence that a distributor would be unable to achieve adequate distribution by showing movies in alternative venues. The increased market power of the merged firm would likely lead to distributors receiving less in revenue for the exhibition of their pictures, most likely the result of a less favorable percentage of the box office receipts.

30. The reduced revenue remitted to the distributors could lead to fewer movies being produced, or less money being expended on high-quality movies to the ultimate detriment of consumers.

### VI. Requested Relief

WHEREFORE, Plaintiff prays for judgment as follows:

A. That the merger be adjudged to be in violation of Section 7 of the Clayton Act;

B. That a permanent injunction be issued against the Defendants enjoining the merger and ordering divestiture and such other relief as necessary in order to prevent irreparable injury to the Plaintiff and its citizens;

C. That Plaintiff be awarded its costs of suit, including reasonable attorneys' fees; and

//

1  D.  That Plaintiff be awarded such other relief as the Court deems just and proper.

2  Dated: December 19, 2005

3  Respectfully submitted,

4  BILL LOCKYER
Attorney General of the State of California
5  RICHARD M. FRANK
Chief Deputy Attorney General
6  THOMAS GREENE
Chief Assistant Attorney General
7  KATHLEEN E. FOOTE
Senior Assistant Attorney General

ADAM MILLER
Deputy Attorney General
Attorneys for the Plaintiff, State of California

14  40071254.wpd

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **State of California v. Marquee Holdings, et al.**
U.S. D.C. Northern District

I declare:

I am employed in the County of San Francisco, California. I am 18 years of age or older and not a party to the within entitled cause; my business address is 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102.

On December 22, 2005, I served the attached:

    1.    **COMPLAINT FOR EQUITABLE RELIEF FOR VIOLATION OF THE CLAYTON ACT**
    2.    **STIPULATION FOR ENTRY OF FINAL JUDGMENT**
    3.    **STIPULATED FINAL JUDGMENT**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, California, addressed as follows:

**ILENE KNABLE GOTTS**
**DAMIAN G. DIDDEN**
**Wachtell, Lipton, Rosen & Katz**
**51 West 52nd Street**
**New York, New York 10019**

*Attorneys for Marquee Holdings Inc.*

**DEBORAH L. FEINSTEIN**
**Arnold & Porter LLP**
**555 12th Street, NW**
**Washington, DC 20004**

**JENNIFER L. CUMMINGS**
**Arnold & Porter LLP**
**90 New Montgomery Street**
**Suite 600**
**San Francisco, CA 94105**

*Attorneys for LCE Holdings, Inc.*

Proof of Service for Complaint
December 22, 2005
Page 2

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 22, 2005, at San Francisco, California.

| Anh Ho | [signature] |
|---|---|
| Typed Name | Signature |